Filed 1/21/25  P. v. Cruz CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALVARO ELVIRA CRUZ,<br><br>Defendant and Appellant. | F084690<br><br>(Super. Ct. No. BF186633A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Brian M. McNamara, Judge.

Dale Dombkowski, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

In June 2021, defendant Alvaro Elvira Cruz shot and killed the owner of a parcel of land he was renting. The jury convicted defendant of first degree murder by means of discharging a firearm from a motor vehicle, and found he personally and intentionally discharged a firearm. (Pen. Code, §§ 187, subd. (a), 189, 12022.53, subd. (d).)[1] The trial court sentenced defendant to a term of 25 years to life for murder and imposed a lesser term of 10 years for the firearm enhancement under section 12022.53, subdivision (b).

Defendant filed a timely notice of appeal. Defendant claims that the trial court erred in failing to instruct the jury, sua sponte, on voluntary manslaughter based on sudden quarrel or heat of passion; and that with respect to prosecution eyewitness Raymond Z., the court violated his rights to cross-examine an adverse witness, to effective assistance of counsel, and to a fair trial. He also claims that the prosecutor committed *Doyle* error by using his post-*Miranda* invocation silence against him, defense counsel rendered ineffective assistance of counsel (IAC) if his *Doyle* claim is deemed forfeited, and the prosecutor committed *Schuler* error during closing argument by relying on his physical size to undermine his claim of self-defense.[2] Finally, defendant claims that, cumulatively, the errors deprived him of due process and a fair trial.

The People dispute any errors occurred.

We conclude the trial court did not have a sua sponte duty to instruct on heat of passion because the instruction was not supported by substantial evidence, and we find defendant's claim of constitutional errors arising from Raymond's cross-examination both forfeited for failure to object and lacking in merit. We also reject defendant's claim of *Doyle* error by the prosecutor, which moots defendant's related claim of IAC, and we

---

[1] All further statutory references are to the Penal Code.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*); *United States v. Schuler* (1987) 813 F.2d 978 (*Schuler*).

reject his claim of *Schuler* error by the prosecutor. Finally, we necessarily reject defendant's claim of cumulative error and affirm the judgment. However, on our own motion, we direct the trial court to correct the minute order from the sentencing hearing and the abstract of judgment to reflect imposition of a 10-year firearm enhancement under section 12022.53, subdivision (b), rather than under section 12022.53, subdivision (d).

**FACTUAL SUMMARY**

## I.     Events Preceding Shooting

Narciso Martinez's family owned a ranch outside of Wasco on Gun Club Road, where Martinez's father raised roosters and grew pomegranates and pistachios. After his father's death, Martinez began cultivating marijuana on the ranch and he continued raising roosters, along with chickens. He also parceled some of the land and rented it to others, including defendant. Martinez, his girlfriend, Marisol G., and his cousin, Raymond Z., sometimes stayed in a trailer in the northeast corner of the ranch. There was another trailer in the northwest corner. Defendant, who was known as "Grande" or "El Grande," occupied the southwestern corner of the ranch, where he had a greenhouse and a shack with bedding in it.

A dispute developed between Martinez and defendant over money defendant owed, and Martinez wanted defendant off the property. On the morning of the shooting, Martinez, Marisol, and Raymond were about to eat breakfast when defendant's brother, P., drove up in a black truck. There were other people in the truck, but Raymond could not see who they were. He did not see defendant. Raymond overhead P. and Martinez speak about someone leaving and after an agreement was reached, P. drove off.

After finishing breakfast, Marisol went back inside the trailer, and Martinez and Raymond tended to the roosters. They saw a cloud of dust, but no one had driven in the main entrance. Martinez told Raymond to be cautious because someone drove onto the property and did not want to be seen. They continued working but Martinez was growing

3.

angrier and, referring to Grande, said, "'They're here,'" and, "[W]e need to go kick him out."

Martinez, Marisol, and Raymond walked together from their trailer toward the southwest corner of the ranch. At Martinez's direction, Marisol went toward one of the greenhouses to speak with someone there. Martinez and Raymond walked in a different direction into a field of pomegranate trees, which was separated from defendant's parcel by a chicken wire fence.[3]

## II.     Martinez's Murder

### A.     Raymond's Testimony

As they were walking in the field of pomegranate trees, Raymond saw Martinez tense up. He then saw Grande standing next to a dark vehicle, which he thought was a Lincoln Navigator.[4] Martinez kept walking as he and Grande shouted at each other, and Martinez told Grande to leave. Martinez picked up a broken shovel and threw it in the direction of Grande. The shovel hit the wire fence and bounced back, hitting the ground. Grande grinned at Martinez like he was "coaxing [Martinez] in," and Raymond said defendant's smile "put fear in [him]." Grande's parcel was supposed to remain accessible from the larger ranch at all times, but the opening had recently been closed with wire and pieces of wood. After trying to pull the wire down, Martinez entered the parcel by jumping over the wire fence.

---

[3]     The jury saw an aerial photograph of the ranch. Defendant's parcel of land was located in the southwest corner of the property. In the northwest corner of defendant's parcel, there was a greenhouse situated horizontally and in the middle of the eastern fence line, there was a shack. Directly east of defendant's parcel was a field with low, shrub-like pomegranate trees where Raymond witnessed the shooting. Two more greenhouses were located directly north of the pomegranate field, situated horizontally. Directly east of the pomegranate field was a fourth greenhouse, situated vertically. Marisol was inside this greenhouse during some of the events and outside of it on the north end by the pomegranate field when Martinez was shot.

[4]     Raymond explained the pomegranate trees were like shrubs or bushes, and he had a clear view of what happened from where he was standing.

At that point, Grande was in his vehicle, starting to leave. When he saw Martinez enter the parcel, Grande put the vehicle in reverse and backed up toward Martinez like he was going to run Martinez over. The windows to the vehicle were down, and Martinez stepped sideways and grabbed onto the vehicle's frame between the driver's door and the passenger's door. Martinez shouted at Grande to stop and either get out and fight him or leave. Grande drove forward with Martinez still hanging onto the vehicle.

As the vehicle moved forward, Raymond's view was obstructed by a bin, but he heard Martinez say in Spanish, "'So that's how you're going to do it, with a gun? You're going to pull out a gun on me?'" Martinez was facing Grande, holding onto the vehicle's frame, and Raymond heard two gunshots coming from the vehicle. Raymond dropped to the ground and as Martinez turned in his direction, they made eye contact. Raymond saw Grande put the vehicle in reverse, point a handgun, and shoot Martinez in the back of the head, again grinning the same way as before. Grande then drove south through the fence and fled.

### B. Marisol's Testimony

Marisol also testified for the prosecution, with obvious reluctance. She denied she was afraid to testify, but she repeatedly responded to questions by saying she did not know or did not remember. She and Martinez had been in a relationship for eight or nine months when he was shot, and she stayed in a trailer on the property occasionally. She said she did not know if anyone else stayed on the property and did not recall if anyone rented portions of the property, if she ever saw anyone else there, or if any men other than Martinez and Raymond were there the day of the shooting. She then conceded Martinez had an altercation with another man that day and she, Martinez, and Raymond had stayed the night before in the trailer, but she said she had no memory of events that morning and did not remember if she knew someone named Grande.

Subsequently, Marisol testified that she heard Martinez arguing with the man who rented a parcel of land, whom she had identified in a photo lineup as Grande. The man

was initially not in a vehicle when the argument started, and Marisol saw Martinez reach the fence and jump over it. Marisol missed a portion of the events because, at Martinez's direction, she had gone to tell another man who was inside a greenhouse to move his truck onto the property. However, she subsequently saw the man she identified as Grande inside a gray Lincoln Aviator. She saw Martinez at the driver's side window of the Aviator, she heard three shots and she saw the Aviator speed off. She also saw the man she had talked to inside the greenhouse driving away in his Toyota truck. Martinez turned and fell to the ground. Marisol looked over at Raymond and then called 911.

Marisol testified that neither Martinez nor Raymond had a gun, and she did not have any weapons. On cross-examination, she said that she, Martinez, and Raymond were drinking alcohol the night before the shooting and when she woke up, Martinez and Raymond were drinking. However, she said she had seen Martinez drunk before and he was not drunk that day.

## III. Other Evidence

### A. 911 Call

Marisol called 911 and the recorded call was played for the jury. Marisol reported that her husband had been shot, she thought in the chest. She said she did not know who the shooter was, but he was by himself and left in a gray Lincoln Aviator. Raymond took over the phone call from Marisol and said his uncle had been shot two or three times with a handgun by a man Raymond described as a renter living in a shack.[5] After initially stating he did not know the shooter, Raymond identified him as "El Grande" and said he rammed through a gate and drove south.

In the call, Raymond denied Martinez and the man were arguing over marijuana and said the argument was over the man stealing a dog, taking roosters that were

---

[5]     Raymond explained he referred to Martinez, who was approximately 20 years older, as his uncle and Marisol as his aunt out of respect.

6.

Raymond's, and trying to take over the piece of property. Asked what the men's problem was, Raymond said, "[I]t was more on the personal level than anything else," and "there was just a major ego and disrespect." Raymond also said the man was not supposed to be there and Martinez was caught off guard. He told the dispatcher no one felt safe approaching Martinez and he did not feel it was safe for Marisol and her friend to be out in the open, but he felt safe standing where responding law enforcement could see him.[6]

## B. Marisol's Statements to Detectives

Marisol spoke with deputies at the scene and excerpts of their body camera footage were played for the jury. Marisol told deputies that Martinez was shot by the man renting the space and "[i]t was over a rental agreement …." She also said Martinez was shouting, "'You need to get the fuck out. You need to get out. You need to get out.'" Marisol said it happened very quickly. The man was standing there when Martinez told him to get out. The man got in his truck and Martinez jumped over the fence as the man was driving off. As Martinez approached the truck, Marisol heard a gunshot. Martinez turned around, starting walking toward her, and dropped dead. She said she had never seen Martinez with a gun, and he did not have a gun or a knife with him. Marisol heard three shots after the man got inside his vehicle, and she stated they had gone over to that area because Martinez was going to ask what was going on with their dog.

In a different excerpt, Marisol said the fight was over money the man owed for renting the space and a dog. She said they bought a German Shepherd from Grande for $200, and he told them he left the dog for them, but the dog was gone and they wanted it back. She said they walked through the pomegranates so Martinez could talk to Grande about the money he owed them and the dog, and that was why they argued. She said

---

[6]    Evidence showed the woman described as Marisol's friend in the 911 call was Ana D., who was inside a trailer in the northwestern corner of the property when the shooting occurred.

Grande "gave [them] a bogus ass story" the day before about the dog being at the pound, and he said he would find the dog for them because it was chipped.

Marisol did not know Grande's real name, but she said she would recognize him if she saw him again. She described him as the deputy's height, which the deputy indicated was 5 feet 7 or 8 inches tall, and although she estimated he was around 200 pounds, she said he was heavyset and stocky.

Marisol later gave another statement to detectives at the station. She said "El Grande" or "Grande" rented a piece of the property. Several days before the shooting, Martinez "was pushing the issue" of a permit for the property, and Grande had shown them "one that was not legit" and had someone else's name on it.[7] She also mentioned the dog they bought for $200 and the "bogus story" Grande gave them about the dog being at the pound. Additionally, she said Grande owed Martinez approximately $5,000 in rent and Martinez was upset about those issues.

The morning of the shooting, Martinez and Raymond were moving roosters around. About 45 minutes before the shooting, Marisol saw a black truck that she thought belonged to Grande's son-in-law. After eating, Martinez told her they were going to walk over and ask about the permit and the dog. As they were walking through the pomegranate field, Martinez saw Grande and started shouting that he needed to leave. She stopped and as Martinez jumped over the fence, he was telling Grande to leave and said, "'You owe and you don't want to leave, you can leave. You can get off the property.'" Grande got in his vehicle and Marisol indicated it was moving slowly. Martinez approached the driver's side. She heard three gunshots and Martinez turned around, walked toward her, and collapsed. Grande took off in what she was certain was a gray Aviator.

---

**7**    One of the detectives testified that he understood the permit related to growing marijuana.

8.

Marisol did not know Grande's real name or where he lived, but she said Martinez obtained a Saturn from Grande and it was registered to Grande or someone in his family. After one of the tires became flat, the car was towed.

Marisol said Grande was around her height, which was 5 feet 6 inches tall, and she estimated he weighed 200 pounds. Told one of the detectives was 5 feet 10 inches tall and weighed approximately 200 pounds, Marisol said Grande was shorter and stockier than the detective. She described him as short, stocky, and heavyset. She subsequently viewed a six–pack photo lineup and selected a photo she was "100%" sure was Grande.

### C. Defendant's Arrest and Statement to Police

Approximately six weeks after the murder, defendant's Lincoln Aviator was located parked outside a residence in Corona. He was arrested as he was getting into the vehicle.

In a video-recorded statement viewed by the jury, defendant told detectives he was from Michoacan in Mexico and had lived on Melba Lane in Bakersfield for approximately nine years. He also told detectives the Lincoln Aviator belonged to him, but he did not have a driver's license and the vehicle was registered in his daughter's name. He said he loaned it out sometimes, although he could not remember the last time that occurred. He explained he barely drove because his eyes were bad, but he conceded he drove to Corona and said he had to drive during the day. Defendant said he worked as a handyman, and he was staying at his uncle's house in Riverside County and working around there because he and his wife were having problems.

Defendant denied ever living or working in Wasco, but said he had one brother who lived there years before. He also denied knowing of a road outside Wasco named Gun Club.

When asked if he owned a Saturn, defendant said he had a green car stolen from him, but was not sure it was a Saturn. He then said his sons told him a week earlier that someone took the car from in front of his house on Melba and a letter about it came to the

9.

house.  He told detectives that he thought the letter said the car was "moved … because it was badly parked," and that they were interviewing him about the car.

## D.    Autopsy and DNA Results

Martinez's body measured six feet in length, and he was overweight with a large abdomen.  He was shot in the heart, which caused his death within minutes, and through the abdomen, pelvis and wrist.  Martinez's wounds were consistent with three gunshots, but based on wound pattern, he could have been shot between two and four times.

The parties stipulated that law enforcement collected two shirts, five socks, and three beer cans from the parcel where Martinez was shot.  The items were swabbed for DNA and, for all 10 items, defendant's DNA matched the DNA profile obtained and Martinez was excluded as a contributor.

## DISCUSSION

## I.    Trial Court Errors

## A.    Instructional Error

Defendant did not request an instruction on sudden quarrel or heat of passion, but he now argues the trial court had a sua sponte duty to instruct on the issue and its failure to do so was prejudicial error.[8]  The People contend no instructional duty arose because

---

[8]    Pursuant to CALCRIM No. 522, the trial court instructed the jury, "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter.  The weight and significance of the provocation, if any, are for you to decide.  [¶]  If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second-degree murder.  Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."  With respect to murder, "[p]rovocation may … reduce murder from first to second degree" by negating or raising reasonable doubt about premeditation or deliberation (*People v. Rivera* (2019) 7 Cal.5th 306, 328, citing *People v. Thomas* (1945) 25 Cal.2d 880, 903), but it "is a pinpoint instruction to which a defendant is entitled only upon request where evidence supports the theory" (*Rivera, supra*, at p. 328, citing *People v. Rogers* (2006) 39 Cal.4th 826, 877–880).  As defendant asserts, he was not charged with willful, deliberate and premeditated murder and, therefore, the instruction that provocation could reduce first degree murder to second degree murder did not apply.  The jury in this case requested the legal definition of provocation, to which the court responded by directing the jury to reread CALCRIM Nos. 505, 520, 522 and 571.  In relation to his argument the court erred in failing to instruct on heat of passion, defendant contends that

there was not substantial evidence that defendant killed Martinez "while subjectively under the actual influence of 'a strong passion aroused by a "provocation" sufficient to cause an "'ordinary [person] of average disposition … to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'""" (Quoting *People v. Moye* (2009) 47 Cal.4th 537, 541 (*Moye*).)

### 1. Standard of Review

"'[A] trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case'" (*People v. Thomas* (2023) 14 Cal.5th 327, 385 (*Thomas*)), including "defenses 'if it appears … the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case'" (*People v. Brooks* (2017) 3 Cal.5th 1, 73).  "'"To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the

---

without a heat of passion instruction, the jury was unable to make use of the provocation instruction.

Provocation for the purpose of reducing first degree murder to second degree murder and provocation within the meaning of voluntary manslaughter are distinct concepts, the former having to do with intent and the latter having to do with circumstances.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1211.)  As discussed herein, we find no error in the failure to instruct on voluntary manslaughter based on heat of passion, because there is not substantial evidence of either sufficient provocation or that defendant acted under the influence of a strong passion. Therefore, the provocation instruction given was inapplicable in this case.  "Giving an instruction that is correct as to the law but irrelevant or inapplicable is error.  [Citation.] Nonetheless, giving an irrelevant or inapplicable instruction is generally '"only a technical error which does not constitute ground for reversal."'" (*People v. Cross* (2008) 45 Cal.4th 58, 67; accord, *People v. Falaniko* (2016) 1 Cal.App.5th 1234, 1247; *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1335.)  "Such error does not implicate the defendant's constitutional rights and is subject to harmless error review under … *Watson* …." (*Falaniko, supra*, at p. 1247, citing *People v. Watson* (1956) 46 Cal.2d 818, 837.)  Although defendant does not claim that the provocation instruction given resulted in any prejudice, we observe there is no reasonable probability that, but for instructing the jury with CALCRIM No. 522, the outcome would have been more favorable to defendant.  (*People v. Schuller* (2023) 15 Cal.5th 237, 251.)

11.

facts underlying the particular instruction exist.'" [Citation.] 'Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense.'" (*Thomas, supra*, at p. 385.) "In assessing the sufficiency of the evidence to support the instruction, 'we view the evidence in the light most favorable to the defendant.'" (*In re Hampton* (2020) 48 Cal.App.5th 463, 480, quoting *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

We review defendant's claim of instructional error de novo. (*People v. Wilson* (2021) 11 Cal.5th 259, 295.)

### 2. Analysis

#### a. Legal Principles

"Murder is defined as 'the unlawful killing of a human being … with malice aforethought' (§ 187, subd. (a)), while manslaughter is defined as 'the unlawful killing of a human being without malice' (§ 192). Thus, the 'distinguishing feature [between the two offenses] is that murder includes, but manslaughter lacks, the element of malice.' [Citation.] Malice exists when 'an unlawful homicide was committed with the "intention unlawfully to take away the life of a fellow creature" (§ 188), or with awareness of the danger and a conscious disregard for life.' [Citation.]

"'Generally, the intent to unlawfully kill constitutes malice.' [Citation.] However, California law recognizes two circumstances where 'a finding of malice may be precluded, and the offense limited to manslaughter, even when an unlawful homicide *was* committed with intent to kill' [citation]: (1) when a person kills '"'in a "sudden quarrel or heat of passion" [citation], or … [(2) when a person] kills in "unreasonable self-defense"—the unreasonable but good faith belief in having to act in self-defense [citations].'"' [Citation.] 'These mitigating circumstances reduce an intentional, unlawful killing from murder to voluntary manslaughter "by *negating* the element of malice that otherwise inheres in such a homicide [citation].'"' (*People v. Schuller, supra*, 15 Cal.5th at p. 252, fn. omitted.)

12.

"A heat of passion theory of manslaughter has both an objective and a subjective component. [Citations.] [¶] '"To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.'" [Citation.]' [Citation.] '[T]he factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.] [¶] To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation. [Citation.] 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."'" (*Moye, supra*, 47 Cal.4th at pp. 549–550.)

> **b.  No Substantial Evidence Defendant Acted in Heat of Passion**

Defendant argues that "there was a firestorm of provocation" in this case. He describes Martinez as a large man who had been drinking all night, was scary and intimidating when angry, and had a major ego. He contends Martinez, feeling disrespected, was growing angrier over his failure to pay rent and was enraged to find him on the property. Martinez "dangerously escalated" their dispute, threw a shovel at him, and began yelling and trying to pull the fence down. There was a shovel lying on the ground and defendant contends Martinez may have threatened him or tried to hit him with it. Martinez grew even angrier when defendant smiled and as he tried to drive away,

Martinez grabbed the window frame and told him to leave or get out and fight. As he tried to drive away, Martinez struck him and grabbed the steering wheel so he would lose control. Defendant then shot Martinez while Raymond's view was obstructed.

"'"'To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist.'"' (*People v. Burney* [(2009)] 47 Cal.4th [203,] 250.) 'Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense.'" (*Thomas, supra*, 14 Cal.5th at p. 385, quoting *People v. Simon* (2016) 1 Cal.5th 98, 132.) In this case, defendant did not testify, and, therefore, the evidence of what led to Martinez's death was necessarily based on Raymond's and Marisol's testimony and out-of-court statements describing the events, and any facts reasonably inferable from their testimony and statements or other evidence admitted. (See *People v. Velazquez* (2011) 201 Cal.App.4th 219, 231 [jury may disbelieve a witness's testimony, but a reasonable inference "'must logically flow from other facts established in the action'"], disapproved on another ground by *People v. Reynoza* (2024) 15 Cal.5th 982, 1013, fn. 22.)

Raymond testified that when Martinez was angry, "nobody could talk to him," and he agreed that Martinez "could be very scary" and one needed to "step aside" when he got that way. However, there is no evidence that Raymond and Marisol knew defendant well or knew how he viewed Martinez, and they did not testify that he feared Martinez. To the contrary, Raymond testified defendant smiled at Martinez like he was coaxing him onto the parcel. Furthermore, Martinez, Raymond and Marisol were not armed with any weapons, and Raymond testified he did not believe Martinez was going to hurt or kill defendant.

As previously noted, defendant asserts that Martinez was a large man with a major ego who was feeling disrespected and *may* have threatened him or tried to hit him with a

14.

shovel. However, with respect to size, although defendant was shorter than Martinez, he was also a large man whose nickname—Grande—meant big or large in Spanish and he was described as heavyset and stocky by Raymond, Marisol and a deputy who testified. Further, the evidence defendant relies on for the proposition that Martinez had a big ego and felt disrespected is based on Raymond's comment, "I, personally I believe there was just a major ego and disrespect," which was responsive to the 911 dispatcher's query regarding what the two men's "beef" or problem with one another was. Raymond's response was ambiguous; he may have been describing defendant or both men. Finally, there is no evidence that Martinez picked up a shovel and threatened defendant with it or tried to hit him with it. The only evidence concerning Martinez's actions and a shovel is that he picked up a broken shovel in the pomegranate field while shouting at defendant to leave and threw the shovel in defendant's direction prior to entering the parcel of land where he was shot. The shovel bounced off the wire fence and fell back into the pomegranate field. There was evidence of other shovels on the ranch property, but there is no evidence Martinez did anything with a shovel other than throw the broken one at the fence in defendant's direction.

The evidence reflects that defendant and Martinez were involved in an ongoing dispute over money defendant owed to Martinez for rent, as well as a permitting issue relating to marijuana cultivation and a missing dog defendant sold Martinez. Martinez wanted defendant off the property as a result, and he had reached some sort of agreement after speaking with one of defendant's relatives that morning. Sometime after seeing a dust trail on the property and believing someone entered the property not wanting to be seen, Martinez, along with Raymond and Marisol, walked toward defendant's parcel of land to tell defendant to leave. Marisol headed in a different direction to speak with a man working inside the greenhouse east of the pomegranate field, either to collect money for a water bill, as Raymond testified, or to tell him to move his truck inside the property, as Marisol testified.

15.

When Martinez and Raymond were in the pomegranate field, Martinez saw defendant on the parcel outside of his vehicle. Martinez became angrier, started yelling at defendant to leave, picked up a broken shovel from the ground and threw it in defendant's direction. Defendant gave Martinez a smile that Raymond found scary, like defendant "was … coaxing [Martinez] in." Raymond testified it was strange because the smile did not look like the Grande Raymond had met before, and when asked if it was possible Grande was scared he was going to die, Raymond stated, "No."

Defendant's parcel was supposed to be accessible from the larger ranch, but access had been recently closed off with wire and boards. After trying to pull the wire fencing down, Martinez went over the fence. By then, defendant was inside his vehicle starting to leave. Seeing Martinez stumble after going over the fence, defendant put his vehicle in reverse and drove toward Martinez, who was brushed by the vehicle as he sidestepped it. Raymond testified it was "like he's trying to go run [Martinez] over in reverse," and he described the maneuver by defendant as "strategic" rather than an attempt at "a retreat." Martinez then grabbed onto the frame between the two open driver's side windows, and he told defendant to stop and to either leave or fight.

As Martinez held on, defendant drove forward. The two were scuffling and Martinez was trying to knock defendant's arms off the steering wheel, "like [Martinez] was trying to get [defendant] to stop steering or lose more control of the vehicle as well as prevent himself from falling off." Raymond also testified Martinez was trying to hang on "so he wouldn't fall and possibly get pulled underneath the car, while [defendant] was trying to push off of him so [Martinez] couldn't hold onto it." As the vehicle moved forward, Raymond's view became obstructed by a bin, and he heard Martinez shout, in Spanish, "'So that's how you're going to do it, with a gun? You're going to pull out a gun on me?'" Martinez was face-to-face with defendant at that point, holding onto the vehicle's frame. Raymond then heard two gunshots, and he dropped to the ground.

16.

Defendant again smiled in the way that caused Raymond fear, fired a third shot, and drove off, crashing through the south fence line.

As previously recognized, while the jury may disbelieve a witness, mere disbelief cannot support a reasonable inference of another fact that is not otherwise supported by evidence in the record. (*People v. Velazquez, supra*, 201 Cal.App.4th at p. 231.) In this case, we conclude there is not substantial evidence in the record to support the theory that defendant was provoked and that he shot Martinez "while under 'the actual influence of a strong passion' induced by such provocation." (*Moye, supra*, 47 Cal.4th at p. 550.)

"'Generally, it is a question of fact for the jury whether the circumstances were sufficient to arouse the passions of the ordinarily reasonable person.'" (*People v. Millbrook, supra*, 222 Cal.App.4th at p. 1140, quoting *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1705 & citing *People v. Beltran* (2013) 56 Cal.4th 935, 950–951.) However, "A defendant may not provoke a fight, become the aggressor, and, without first seeking to withdraw from the conflict, kill an adversary and expect to reduce the crime to manslaughter by merely asserting that it was accomplished upon a sudden quarrel or in the heat of passion. The claim of provocation cannot be based on events for which the defendant is culpably responsible." (*People v. Oropeza* (2007) 151 Cal.App.4th 73, 83, citing *People v. Johnston* (2003) 113 Cal.App.4th 1299, 1312–1313 & *People v. Hoover* (1930) 107 Cal.App. 635.)

Here, the provocation, as reflected by the evidence, was Martinez yelling at defendant to leave and get off the ranch property, throwing a shovel in defendant's direction from the other side of a wire fence, jumping over the fence, and struggling with defendant over control of the steering wheel *after* defendant tried to back into him, brushing him with the vehicle in the process and then driving forward as Martinez clung to the vehicle. Raymond was the only witness to testify who saw the events unfold in

17.

virtually their entirety,[9] and he was unequivocal in his testimony that defendant was driving forward when he saw Martinez stumble after jumping the fence. Defendant then reversed the vehicle toward Martinez strategically rather than evasively, the vehicle brushed Martinez, and defendant pulled a gun and shot Martinez as Martinez was holding the vehicle's frame and struggling with defendant over the steering wheel. There is no evidence Martinez had any weapons or he threatened defendant, and there is no evidence that defendant was afraid of Martinez.[10]

To support the instruction, "'the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection'" (*Moye, supra*, 47 Cal.4th at p. 550), and "a passion for revenge cannot satisfy the objective requirement for provocation. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144.) As we explained long ago, 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man'" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 301, quoting *People v. Logan* (1917) 175 Cal. 45, 49). Here, the evidence of sufficient provocation falls short.

---

[9] Raymond testified his direct view was briefly obstructed by a bin when the vehicle moved forward and Martinez started shouting about defendant pulling a gun on him. He heard two shots, hit the ground, and then looked up again to see defendant aiming his gun at Martinez before firing a third shot.

[10] Defendant argues that Raymond thought defendant may have been afraid of Martinez. Raymond testified defendant was taking his property off the parcel of land bit by bit and stated, "I know I seen him taking things. Whether it could have been he was just taking them or that he actually wasn't paying rent, I cannot say for sure." Defense counsel then asked if it was just as possible that defendant was moving his property because he was afraid of Martinez. Raymond responded, "That's a possibility." Nothing in the record suggests Raymond knew defendant's motivation in this regard or otherwise supports a reasonable inference that defendant feared Martinez. Raymond's speculative response to defense counsel's hypothetical inquiry does not constitute substantial evidence that defendant feared Martinez. (*Thomas, supra*, 14 Cal.5th at p. 385.)

Further, "the accused must be shown to have killed while under 'the *actual* influence of a strong passion' induced by such provocation." (*Moye, supra*, 47 Cal.4th at p. 550, italics added.) Again, the evidence of what specifically occurred immediately before the shooting is limited to Raymond's testimony and he denied that defendant was smiling at Martinez out of fear for his life. Instead, he described the smile as coaxing Martinez to come onto the parcel and said that after Martinez stumbled over the fence, defendant put his vehicle in reverse not to retreat or flee, but to attempt to run Martinez over in "[a] strategic move."

Defendant fails to persuade us that the record contains substantial evidence that his reason """"was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.""" (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 478; accord, *People v. Rountree* (2013) 56 Cal.4th 823, 855; *People v. Vargas* (2020) 9 Cal.5th 793, 828.) Absent substantial evidence that defendant acted in the heat of passion, the trial court did not have a sua sponte duty to instruct the jury. However, as discussed next, even if we assume error for the sake of argument, we conclude the omission of the instruction was not prejudicial.

### 3. No Prejudice

"[W]hen there is substantial evidence of [heat of passion] in a murder case, the trial court's failure to instruct on that theory precludes the jury from making a factual finding that is necessary to prove the malice element of murder. The error therefore amounts to a violation of the federal Constitution and is subject to *Chapman*'s[11] 'beyond a reasonable doubt' standard for evaluating prejudice." (*People v. Schuller, supra*, 15 Cal.5th at p. 260.) Under this standard, where there is error, reversal is required "unless the reviewing court is persuaded that """[n]o reasonable jury'" would

---

[11] *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).

19.

have found in favor of the defendant on the missing fact, given the jury's actual verdict and the state of the evidence' [citation]. When making this evaluation, the reviewing court ' "does not … 'become in effect a second jury to determine whether the defendant is guilty.' [Citation.] Rather a court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." ' " (*Id.* at p. 261.)

The jury rejected the claim that defendant acted in perfect self-defense or imperfect self-defense, thereby rejecting the argument that defendant acted, reasonably or unreasonably, out of the belief he needed to defend himself. With respect to heat of passion, neither defendant nor any other witness testified concerning what defendant may have thought, felt, or known. Marisol saw the beginning of the argument in the pomegranate field and heard the shots fired, but only Raymond testified concerning what specifically occurred in the seconds between when Martinez jumped over the fence and when he was shot, and the jury requested readback of his testimony.[12] Raymond's

---

[12] The trial evidence indicates Raymond's statements to law enforcement were consistent with his testimony, and nothing in the cold record suggests he was a difficult or an uncredible witness, notwithstanding defendant's contrary characterization in the trial court and on review. When defense counsel requested to treat Raymond as a hostile witness, the court stated, "As to hostile witness, how is he hostile? Is he not giving you the answers you want or is he being evasive?" After defense counsel argued Raymond was being evasive, the court said, "In terms of this witness being evasive, I'm not going to find that. He's answered questions.… [¶] … He's not being evasive. I'm not going to grant that status for the witness."

On review, defendant argues Raymond "clearly had lied" and "fabricated testimony." The basis for this assertion is Raymond's testimony that he saw defendant fire the third shot at the back of Martinez's head and saw some sort of matter fly out of Martinez's mouth, while the autopsy reflected wounds only to Martinez's heart, abdomen, pelvis and wrist. Credibility determinations rest with the jury (*In re Lopez* (2023) 14 Cal.5th 562, 591), but we do not find defendant's characterization of the record persuasive given that Martinez was unquestionably shot to death, the event was likely very traumatizing for Raymond to witness, the shooting happened in mere seconds, and there is no discernible motive for Raymond to lie about the location of the final shot. It is possible some visible matter was expelled as a result of the shot, and the more reasonable explanation for his testimony about the location of the third shot is simply a mistake of fact given the circumstances. As the People point out, one possible explanation is that Martinez's wrist, which was hit, was near his head when the shot was fired.

testimony at trial concerning defendant's scary smile and his attempt to back his vehicle into Martinez, and Martinez's statement about defendant pulling a gun were consistent with his statement to detectives after the murder. As previously discussed, nothing in Raymond's testimony, or other trial evidence, supports the existence of objectively sufficient provocation or supports a finding that defendant shot Martinez while under the actual influence of a strong passion induced by sufficient provocation. Under these circumstances, the absence of an instruction on heat of passion was harmless beyond a reasonable doubt.

## B. Deprivation of Effective Cross-examination, Assistance of Counsel and Fair Trial

During defendant's cross-examination of Raymond, the trial court sustained multiple objections by the prosecutor, as detailed in part I.B.3.b. of the Discussion. After excusing the jury for the day, but while Raymond remained on the witness stand, the trial court admonished defense counsel for "unacceptable" behavior that included repeatedly asking questions laced with facts not in evidence, failing to let the witness finish, making "cheap comments," and employing argumentative body language and tone of voice. Defendant claims that these errors by the trial court violated his constitutional rights to effective cross-examination, effective assistance of counsel, and a fair trial.

The People contend that defendant forfeited his claims for failure to object. On the merits, they dispute that any error occurred.

As discussed next, defendant did not object to the trial court's rulings or actions on the grounds now advanced on appeal. Therefore, he forfeited his claims. However, his claims also fail on their merits. The trial court's rulings and admonition of counsel did

In response, defendant doubles down, arguing, "An injury to Mr. Martinez's wrist provides no reason to believe that [Raymond] was mistaken. [¶] The coroner testified there were no gunshot wounds either to Mr. Martinez's head or to the back of his body. [Citation.] [¶] [Raymond] absolutely and clearly lied about this." We disagree with this characterization for the reasons previously set forth.

21.

not violate his constitutional rights by infringing on his right to effective cross-examination, to effective assistance of counsel, or to a fair trial.

### 1. Legal Principles

The trial court has broad discretion to control trial proceedings, including the questioning of witnesses and the introduction of evidence. (§ 1044; *People v. Nieves* (2021) 11 Cal.5th 404, 439.) "The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'" (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678.) "'"[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, 'to expose to the jury the facts from which jurors … could appropriately draw inferences relating to the reliability of the witness.'" [Citation.] However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citations.] California law is in accord. [Citation.] Thus, unless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witness's] credibility" [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment.'" (*People v. Linton* (2013) 56 Cal.4th 1146, 1188; accord, *People v. Dalton* (2019) 7 Cal.5th 166, 217; *People v. Williams* (2016) 1 Cal.5th 1166, 1192.)

"'Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense.'" (*Perry v. Leeke* (1989) 488 U.S. 272, 280, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 686.) "'Counsel … can also deprive a defendant of the right to

effective assistance, simply by failing to render "adequate legal assistance," [citations].'" (*Leeke, supra*, at p. 280, quoting *Strickland, supra*, at p. 686.)

Concerning the right to a fair trial, "Although the trial court has both the duty and the discretion to control the conduct of the trial [citation], the court 'commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression it is allying itself with the prosecution' [citation]. Nevertheless, '[i]t is well within [a trial court's] discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying behavior.' [Citation.] Indeed, '[o]ur role … is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.'" (*People v. Snow* (2003) 30 Cal.4th 43, 78.)

### 2. Forfeiture Doctrine

"The forfeiture doctrine is a 'well-established procedural principle that, with certain exceptions, an appellate court will not consider claims of error that could have been—but were not—raised in the trial court. [Citation.]' [Citations.] Strong policy reasons support this rule: 'It is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided. [Citations.]' [Citation.] "'"The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal."'"'" (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114.)

Defendant attempts to excuse his failure to object on the grounds now advanced on appeal by arguing it would have been futile to object. However, this claim finds no support in the record. The record does not indicate that the trial judge was intemperate in general or with defense counsel in particular, notwithstanding defendant's contrary characterization. With respect to defendant's claim that the court violated his constitutional rights by admonishing him outside the presence of the jury, but in front of Raymond, at no point did defense counsel request Raymond be excused or object to his presence.[13] Nor did counsel include that claim in his subsequent motion for a new trial. In warning defense counsel about certain behaviors, the court expressed that it understood what he was doing, but he needed to operate "within the rules." The court also stated that counsel was entitled to make a record and the court would "never stop [him] from doing that."

There is also no support in the record for defendant's claim that it would have been futile for defense counsel to object to the violation of defendant's rights to effectively cross-examine Raymond and to the effective assistance of counsel free from government inference, had counsel believed defendant's constitutional rights were being infringed upon by the trial court. "'[D]iscretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue.'" (*In re Sheena K.* (2007) 40 Cal.4th 875, 887–888, fn. 7.) The circumstances in this case do not present occasion to depart from this general principle. "[A] party cannot argue on appeal that the trial court erred in failing to conduct an analysis it was not asked to conduct" (*People v. Fruits* (2016) 247 Cal.App.4th 188, 208, fn. omitted), and strong policy reasons support application of the rule in the situation presented in this case (*People v. Stowell, supra*, 31 Cal.4th at p. 1114). Therefore, we find defendant's claims of constitutional error by the

---

**13** During oral argument, appellate counsel conceded he was unable to identify any articulable prejudice resulting from Raymond's presence during this exchange.

trial court forfeited for failure to object in the trial court. (*People v. Thornton* (2007) 41 Cal.4th 391, 427; *People v. Armstrong* (2019) 6 Cal.5th 735, 799.)

### 3. No Error

#### a. Body Language and Tone of Voice

We also find no constitutional error. As a threshold matter, the trial court found defense counsel unduly argumentative with respect to both body language and tone, and the court declined to find Raymond was a hostile witness, rejecting defendant's contention that he was being evasive. "On appeal, we presume that a judgment or order of the trial court is correct, "'[a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.'""" (*People v. Giordano* (2007) 42 Cal.4th 644, 666.) The moving party bears the burden of demonstrating error on appeal. (*People v. Gamache* (2010) 48 Cal.4th 347, 378; *People v. White Eagle* (1996) 48 Cal.App.4th 1511, 1523; *People v. Clifton* (1969) 270 Cal.App.2d 860, 862.) We cannot discern counsel's body language or tone, or Raymond's demeanor, from the cold record, but to the extent the trial court erred in reaching these conclusions, defendant fails to so demonstrate.

#### b. Rulings on Objections

Turning to cross-examination, defendant does not claim prejudicial error with respect to the trial court's rulings on the prosecutor's objections, but instead cites to these instances to bolster his claim that his counsel was restricted from conducting an effective cross-examination and that the court interfered with his right to effective assistance of counsel, in violation of his constitutional rights. The areas of questioning at issue related to the identity of the man in the greenhouse Marisol spoke to, Martinez's plan that day, cockfighting, Raymond's involvement in marijuana sales, the shovel Martinez threw, and defendant's right to be on the parcel.

With respect to the man in the greenhouse who fled in his truck after shots were fired, Raymond testified the man gave him several different names. Defense counsel

25.

asked if the man was afraid of Raymond, why the man would lie to Raymond, if Raymond knew why the man lied, and why the man would give Raymond so many different names. The trial court sustained the prosecutor's first two objections on grounds of argumentativeness, speculation and lack of foundation, but told counsel to reword the question. The court sustained the third objection because the question assumed facts not in evidence—that the man lied—and the fourth objection because Raymond responded, "*Maybe* he didn't want me to know who he was." (Italics added.) Counsel then moved on to a different topic. Nothing in this exchange suggests the court unduly restricted cross-examination on the subject.

Defense counsel also questioned Raymond concerning Martinez's plan when he, one, walked over to defendant's parcel and, two, struggled with defendant over the vehicle's steering wheel. Raymond testified that Martinez had asked Ana to leave "[b]ecause he did not want anybody else to be caught in that situation because this was not a spur-of-the-moment thing." Counsel worded follow-up questions as, "Are you saying in [Martinez's] plan he didn't want any witnesses to you guys going in and killing …," and, "He didn't want any witnesses on that day so that he could go in to talk to [defendant] and nobody was going to be able to see what was going on?" The trial court sustained the prosecutor's objections to the questions as argumentative, struck the first question and said, "What the witness said was he didn't want anyone involved, which is different from your question." Counsel then asked if Martinez told Raymond why he did not want anyone there, and Raymond responded that Martinez did not want Ana to be in danger because defendant had made threats. During the next several questions, counsel twice told the witness, "Listen to my question," and after the second time, the court told counsel, "I will deal with the witnesses. It's protocol in the courtroom." Raymond subsequently responded that he did not hear defendant make any threats. This exchange, too, fails to support defendant's claim that the court violated his constitutional rights by

impermissibly restricting counsel's cross-examination of Raymond or interfering with his right to effective assistance of counsel.

The next line of questioning that forms the basis of defendant's claim involved cockfighting. Raymond testified there were roosters on the property, and he was learning how to raise and breed them. Defense counsel asked, "Where did the cockfighting happen?" and the court sustained the prosecutor's objection based on facts not in evidence. Counsel then asked, "There were no cockfights on that property? It was just raising some types of roosters; is that right?" After the prosecutor objected, the court said, "He's breeding. The witness said he's breeding. He's learning that whole trade. We'll stick to that. The other stuff, let's leave it alone." Raymond subsequently responded no when asked, "The trade [you were learning] was cockfighting?" Counsel then asked, "Do you remember seeing anywhere in that property knives that were used in cockfighting?" Raymond responded no, and the court overruled the prosecutor's objection to the question because it asked if Raymond saw something. The court then told counsel to move on, which he did.

During direct examination, Raymond had testified that "everybody assumed [Martinez] was raising [the roosters] to fight," but he was only "learning [from Martinez] how to mix the breeds together." Raymond and Marisol both denied any knowledge of cockfighting on the ranch or seeing any cockfighting blades on the ranch. It was up to the jury to determine whether these denials were believable, but defense counsel did not succeed in eliciting any admission to cockfighting from Raymond or, subsequently, Marisol. Relevant to defendant's claim of error, however, the court did not prevent defense counsel from adequately exploring the issue during Raymond's cross-examination.

Counsel also sought to question Raymond about marijuana on the property. Raymond testified that Martinez rented parcels to others to grow marijuana if they had permits, but he denied assisting Martinez and admitted he had no personal knowledge

27.

whether those activities were legal or illegal.  Raymond had a conviction for selling marijuana and he said he knew what it looked like, but when counsel asked if he knew the parts of the plant, he responded, "Actually, I don't know because if you look at the facts of that case[.]"  Counsel began, "I don't want" before the court interrupted that they were not litigating anything and admonished the jury concerning a witness convicted of a felony.  The prosecutor then asked for a sidebar, after which the court rephrased its admonition and defense counsel moved to a different line of questioning.  The sidebar discussion is not part of the record, but nothing about the reported exchange suggests the court unconstitutionally restricted cross-examination on this subject.

In support of his argument that his constitutional rights were violated, defendant also cites the following questions, to which the court sustained objections:

> "Stop one moment.  [¶]  He tries to hit [defendant] with a shovel, right, and then what does he do?"

> "And then finally, although [defendant] is on his side of the property, legally doing—minding his own business, [Martinez] invades [defendant's] property?"

> "In other words, according to what you're telling me—let me see if I understand this.  [¶]  [Martinez] was going to make every possible effort to keep [defendant] in that land so he could do him harm?"

> "Which is part of his land where he has a legal right to be, correct?"

> "Let me see if I understand.  [¶]  You could not go help your dying uncle, but you had enough of a frame of thought to take that barrel that you've been carrying with you *as part of what you guys were going to do to [defendant]* and you took it across the fence?"[14] (Italics added.)

---

[14]    As they walked toward defendant's parcel, Raymond had a plastic barrel and Martinez had a rooster, and defense counsel questioned Raymond about the barrel.  On cross-examination, Raymond testified, "We were going to talk about how we were going to put the barrels of roosters right here.  We were going to start taking these trees out, of pomegranates, and make this into another chicken yard."  During closing argument, defense counsel stated, "You have a guy who is—that is drunk out of his mind, you have another guy that is walking around with a barrel—assuming that is to be pieces of human once they kill the renter," which drew an objection by the prosecutor, unsurprisingly.  While this more extreme comment occurred during

28.

After the last question, the court excused the jury for the day and stated, "We're finished for the day with that nonsense."

The court also sustained objections to the following questions on the ground of speculation: "[W]hat do you think [Martinez] was going to do to [defendant] if he pulled him out of the truck?" and "If you had been in that truck—you— [¶] … [¶] … and you saw [Martinez] the way he was that day …." After the second objection was sustained, the court explained, "This person a percipient witness is relaying to you what he sees not what he thinks and he [has] relayed certain things and you can certainly discuss that. But what you are setting up is a situation that didn't happen so that's why it was sustained. A further question?"

As previously noted, defendant does not pursue claims of prejudicial error based on the trial court's rulings to the prosecutor's objections, but relies on these rulings as foundation for his claim that the court impermissibly limited cross-examination and interfered with his right to effective assistance of counsel. We find no merit to this assertion. The record reflects that the court sustained objections based on assuming facts not in evidence and argumentativeness. As related to Martinez and a shovel, the evidence was limited to Raymond's testimony that Martinez picked up a broken shovel in the pomegranate field and threw it in defendant's direction, after which it hit the fence and bounced to the ground. There was also no evidence that Martinez had formulated or communicated a plan to harm or kill defendant, and there was no evidence establishing the legality or illegality of defendant's presence on the property or the legality or illegality of Martinez's view that defendant needed to be off the property. Further, the court expressly found counsel's body language and tone of voice argumentative. Under these circumstances, defendant fails to persuade us that the court's rulings were infirm

---

closing argument, it illustrates the general interjection of facts not in evidence that frustrated the trial court during counsel's cross-examination of Raymond.

even under state law. In any event, the record does not support defendant's claim that his rights to effective cross-examination and to the effective assistance of counsel were infringed upon by the court.

### c.  Interruptions

Finally, defendant points out several instances where the court interrupted the questioning. We discern no impropriety under state or federal law. The court addressed interruptions by *both* defense counsel and Raymond. For example, the trial court interrupted cross-examination to say, "Stop. The reason I say that, in the courtroom both of you—question, wait until it comes out, answer, vice versa. Nobody's fault. It's the way it is sometimes. It's unfair on the jury, unfair on [the court reporter]. Let's do it that way. Question again. Let's do it how it should be done." Subsequently, the court again interrupted and stated, "Ask a question. Don't dare answer until I let you, and I'll do it vice versa and we'll get somewhere. It's unfair on the jury. They've got to listen. They're doing it brilliantly, but this is unfair."

We are limited by our confinement to a cold record review, as we have stated. However, the record affirmatively reflects defense counsel and Raymond interrupted each other at times, and the trial court attempted to exercise control over the proceedings in that regard. Additionally, the court reminded defense counsel that it would address witness issues. The record of the court's handling of these issues does not suggest any infringement on defendant's constitutional rights.

### d.  Conclusion

In sum, defendant claims that the trial court violated his constitutional rights to effectively cross-examine Raymond, to the effective assistance of counsel, and to a fair trial, but defendant did not object or otherwise alert the trial court to these issues. The record does not support his claim that it would have been futile to object and, therefore, he has forfeited these claims. Notwithstanding the forfeiture of these claims, we also find no support for his claim that the trial court's rulings on the prosecutor's objections,

30.

attempts to control the courtroom proceedings, and admonishment to counsel outside the presence of the jury violated his constitutional rights. Given the absence of any constitutional error, we do not address prejudice.

## II. Prosecutorial Errors

### A. *Doyle* Error

#### 1. Background

Following his arrest, at the outset of his video-recorded interrogation, defendant was advised of his *Miranda* rights. He spoke with detectives for a period of time and answered general questions before invoking his right to counsel, and the pre-invocation portion of the recorded interrogation was played for the jury.[15] During interrogation, defendant said he lived in Bakersfield, denied working in Wasco or having any connection to Wasco other than a brother who lived there in the past, and denied knowing of Gun Club Road. The jury was instructed on perfect and imperfect self-defense and, during closing argument, defense counsel argued self-defense. The prosecutor argued, in relevant part, that defendant lied during interrogation and never told detectives Martinez attacked him or he had to defend himself.

On appeal, defendant claims that the prosecutor committed *Doyle* error by commenting on his post-*Miranda* invocation silence, in violation of his rights under the Fifth and Fourteenth Amendments.[16] The People deny *Doyle* error occurred. They

---

[15] The recorded statement viewed by the jury did not include either defendant's invocation of his right to counsel or the question that triggered the invocation, which was the first question detectives asked relating to the death of Martinez.

[16] Defense counsel objected during closing argument, and, outside the presence of the jury, he moved for dismissal, alleging the prosecutor was commenting on defendant's right to remain silent, postinvocation. Counsel cited *Griffin*, which prohibits the prosecutor from commenting on the defendant's failure to testify at trial. (*People v. Tom* (2014) 59 Cal.4th 1210, 1223, citing *Griffin v. California* (1965) 380 U.S. 609, 615 (*Griffin*).) On appeal, defendant argues that if his objections were not sufficient to preserve his claim of *Doyle* error, he received IAC. (*People v. McCullough* (2013) 56 Cal.4th 589, 593 ["""'[A] constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.'"""].) In addition to objecting, counsel

31.

contend the jury heard defendant's pre-invocation statement to detectives and would have understood that the prosecutor's comments related to what defendant did and did not tell detectives during that statement. They also contend there was no prejudice to defendant.

### 2. Legal Principles

In *Doyle*, the United States Supreme Court held that the use of a defendant's silence following receipt of *Miranda* warnings to impeach him violates the due process clause of the Fourteenth Amendment. (*Doyle, supra*, 426 U.S. at p. 619; accord, *Anderson v. Charles* (1980) 447 U.S. 404, 407 (*Anderson*); *People v. Clark* (2011) 52 Cal.4th 856, 959 ["*Doyle* also prohibits a prosecutor from using a defendant's silence against him during direct examination of an interrogating officer, before the defendant testifies in his own behalf."].) "'*Doyle* rests on "the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial."'" (*Greer v. Miller* (1987) 483 U.S. 756, 763, quoting *Wainwright v. Greenfield* (1986) 474 U.S. 284, 291.)

Thus, "*Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances. But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." (*Anderson, supra*, 447 U.S. at p. 408.) "'An assessment of whether the prosecutor made inappropriate use of [the] defendant's postarrest silence requires consideration of the context of the prosecutor's inquiry or

<hr />

filed a motion for a new trial prior to sentencing that raised *Griffin* error and, discussed, *post*, *Schuler* error. (§ 1181, subd. (5); *Schuler, supra*, 813 F.2d at pp. 981–982.) Although the People address defendant's IAC claim, they do not argue that defendant forfeited his claim of *Doyle* error, and the record expressly reflects that counsel's objections and argument placed the trial court and the prosecutor on notice as to the basis of the claim he now pursues on appeal. Therefore, his claim that the prosecutor used his postinvocation silence against him during closing argument was preserved for review and we do not address his related IAC claim.

argument'" (*People v. Hollinquest* (2010) 190 Cal.App.4th 1534, 1557 (*Hollinquest*), quoting *People v. Champion* (2005) 134 Cal.App.4th 1440, 1448 (*Champion*)), and the United States Supreme Court has cautioned against too finely parsing cross-examination questions where the questions may be designed "to elicit an explanation for a prior inconsistent statement" rather than "draw meaning from silence" (*Anderson, supra*, at p. 409).

### 3. Analysis

#### a. No Error

As an initial matter, defendant did not testify and in *Seumanu*, the California Supreme Court declined to consider whether the scope of *Doyle* includes closing argument. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1334 & fn. 10.) However, in *Hollinquest*, the Court of Appeal concluded that "'the principles of *Doyle* apply even if a defendant does not take the stand in his own defense thereby subjecting himself to potential impeachment.'" (*Hollinquest, supra*, 190 Cal.App.4th at p. 1557, quoting *United States v. Fambr*o (2008) 526 F.3d 836, 841.) The claim in *Hollinquest* nevertheless related to testimony, in contrast with this case. (*Hollinquest, supra*, at pp. 1554, 1560–1561 [admission of investigator's testimony violated *Doyle*, but error harmless].) Assuming a claim of *Doyle* error may arise under the circumstances in this case, the prosecutor did not engage in the conduct that *Doyle*—or *Griffin*—forbids, which is the use of defendant's constitutionally protected silence against him. (*Doyle, supra*, 426 U.S. at p. 618; *Champion, supra*, 134 Cal.App.4th at pp. 1147–1448; see *United States v. Robinson* (1988) 485 U.S. 25, 34 ["It is one thing to hold, as we did in *Griffin*, that the prosecutor may not treat a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt; it is quite another to urge, as [the] defendant does here, that the same reasoning would prohibit the prosecutor from fairly responding to an argument of the defendant by adverting to that silence."].)

33.

Defendant repeatedly characterizes his constitutional claim as premised on the prosecutor's use of his postinvocation silence, after he asked for an attorney and the interrogation ended. As previously set forth, between being advised of his *Miranda* rights, postarrest, and asking for an attorney, at which point the interview ended, defendant spoke with detectives. He denied working or living in Wasco and denied any knowledge of Gun Club Road. During closing argument, the prosecutor focused on the statements defendant made to detectives, using them to characterize defendant as a liar and to undermine his trial theory of self-defense. The record is devoid of support for defendant's characterization of the prosecutor's argument as relying on his postinvocation silence at all, let alone as substantive evidence of guilt.[17]

---

**17** The prosecutor argued, for example, "The defendant never said anything about self-defense. The defendant never said [Martinez] attacked him. The defendant never said [Martinez] assaulted him. The defendant never said [Martinez] threatened him. The defendant claimed he doesn't go out there. He doesn't go in that area. He doesn't know a Gun Club Road. He doesn't go work, visit or socialize or an area outside Wasco. The defendant claimed he wasn't there; however the evidence makes it crystal clear that the defendant was there. Again from the witnesses, the DNA, and the phone location data. And then his vehicle that has damage[] consistent with striking a gate. The direct damage on his vehicle do we definitively know that it is directly from the gate? Maybe not but we see that the vehicle that was described by the witnesses is the vehicle the defendant has when he is [in] Corona in Riverside County a month later and it has damage on it consistent with striking a gate. [¶] The defendant said that he had not been to Wasco or the area outside at any time recently for work, to hang out, to visit or to socialize. The defendant—there is no evidence that the defendant called 911. The defendant lied to the police on July 23rd, 2021, when he spoke to Detective Moore with the assistance of Senior Deputy Barajas. He lied to try and get out of trouble to avoid getting into trouble. He never said anything about self-defense, about being assault[ed] or attacked."

Later, during rebuttal, the prosecutor argued, "The defendant himself when he was interviewed never said a thing about being assaulted, being attacked, being threatened or acting in self-defense. He said I wasn't there. He wasn't there according to him in June—July 23rd, 2021, when he was interviewed and now defense counsel is arguing that yeah, he was there but it was self-defense. The evidence doesn't support that. That's an unreasonable conclusion based on the evidence." These arguments do not implicate defendant's postinvocation silence and, discussed next, they do not implicate his silence in response to questions or refusal to answer questions during his interrogation as substantive evidence of guilt. Rather, the prosecutor focused on what defendant said and did not say during his interrogation in fair response to his theory of self-defense advanced at trial.

Nor did error occur to the extent defendant's argument may be fairly construed to include the claim that the prosecutor relied on his silence *during* the interrogation as substantive evidence of his guilt.[18]  "An assessment of whether the prosecutor made inappropriate use of [the] defendant's postarrest silence requires consideration of the context of the prosecutor's inquiry or argument.  (*Greer v. Miller* [(1987)] 483 U.S. [756,] 765–766.)  A violation of due process does not occur where the prosecutor's reference to [the] defendant's postarrest silence constitutes a fair response to [the] defendant's claim or a fair comment on the evidence.  (See *United States v. Robinson* (1988) 485 U.S. 25, 32 (involving a claim of error under *Griffin v. California* (1965) 380 U.S. 609); *Anderson v. Charles* (1980) 447 U.S. 404, 408.)  '*Griffin* and *Doyle*'s protection of the right to remain silent is a "shield," not a "sword" that can be used to "cut off the prosecution's

---

[18]    Defendant relies, in part, on *Hurd v. Terhune* (2010) 619 F.3d 1080 and *Girts v. Yanai* (2007) 501 F.3d 743 (*Girts*) for support.  Both are federal appellate court cases granting petitions for writ of habeas of corpus, and neither is analogous to the facts in this case.  (*People v. Brooks, supra*, 3 Cal.5th at pp. 90–91 [federal appellate court decisions not binding, but may be persuasive].)  In *Hurd*, the defendant, after being taken into custody and *Mirandized*, refused multiple requests by law enforcement to reenact his wife's fatal shooting, which he said was accidental.  (*Hurd, supra*, at pp. 1083–1084.)  During trial, the prosecutor repeatedly relied on his refusal to reenact the shooting as evidence of his substantive guilt.  (*Id.* at p. 1084.)  The Ninth Circuit found prosecutorial error and stated "the right to silence is not an all or nothing proposition.  A suspect may remain selectively silent by answering some questions and then refusing to answer others without taking the risk that his silence may be used against him at trial."  (*Id.* at p. 1087, fn. omitted.)  The court concluded the error was not harmless: "Because the prosecutor repeatedly stressed Hurd's silence to the jury as evidence of his guilt, we cannot say with fair assurance that this evidence did not substantially influence the jury."  (*Id.* at pp. 1090–1091.)

In *Girts*, a divided Sixth Circuit panel court found that the prosecutor's specific use of the defendant's prearrest silence and failure to testify to argue substantive guilt constituted flagrant prosecutorial misconduct necessitating reversal.  (*Girts, supra*, 501 F.3d at pp. 748, 758, 761.)  In this case, as discussed, defendant was not silent in response to questions, he did not refuse to answer questions, and the prosecutor did not rely on his silence as evidence of substantive guilt.  Rather, the comments that defendant did not claim he was attacked or acted in self-defense directly related to his express statements to detectives denying a connection to Wasco or Gun Club Road.

'fair response' to the evidence or argument of the defendant."'" (*Champion, supra*, 134 Cal.App.4th at p. 1448; accord, *People v. Smith* (2021) 70 Cal.App.5th 298, 323–324.)

The interrogation ended when defendant invoked his right to counsel in response to the first question about Martinez. Prior to invoking his right to counsel, defendant was neither silent in the face of questioning nor refused to answer detectives' questions, and the prosecutor did not lean on any purported silence or refusal to answer questions as substantive evidence of defendant's guilt. Rather, the prosecutor focused on defendant's express statements to detectives denying he worked or lived in Wasco, or knew of Gun Club Road. Although the prosecutor commented about the lack of any claim he was attacked or acted in self-defense, those comments must be viewed in the context of defendant's denial of a connection to Wasco and his theory of self-defense pursued at trial. With respect to inconsistent statements used for impeachment, our higher courts have recognized that "each of the 'inconsistent descriptions of events may be said to involve "silence" insofar as it omits facts included in the other version. But *Doyle* does not require any such formalistic understanding of "silence," and we find no reason to adopt such a view in this case.'" (*People v. Collins* (2010) 49 Cal.4th 175, 204, quoting *Anderson, supra*, 447 U.S. at p. 409.) In this context, *Collins* concluded that "questions regarding the defendant's failure to tell the police the same story 'were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement.'" (*Collins, supra*, at p. 204, quoting *Anderson, supra*, at p. 409.) Here, defendant's statements to detectives were inconsistent with his subsequent theory at trial, and the prosecutor used those statements, and the lack of any claim of self-defense, to cast defendant as a liar and undermine his self-defense argument. In these circumstances, the comments were a fair response to the evidence and defendant's trial theory, and we find no merit to defendant's claim of *Doyle* error.

### b. No Prejudice

Moreover, even if we assume error, "it appears beyond a reasonable doubt the error, if any, did not contribute to the verdict." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 60 (*Coffman and Marlow*); see *Chapman, supra*, 386 U.S. at p. 24 ["[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."]; *People v. Thomas* (2012) 54 Cal.4th 908, 936 [*Doyle* error].) As discussed, defendant did not testify, and the defense did not offer any evidence that he acted in self-defense. Rather, defense counsel argued defendant acted in self-defense and it was for the jury to determine what occurred based on Raymond's and Marisol's description of the events surrounding the shooting.

In closing argument, the prosecutor did not rely on either any selective silence during interrogation or any postinvocation silence as substantive evidence of defendant's guilt. Rather, the prosecutor focused on the voluntary statements defendant made prior to invoking his rights to cast him as a liar and contrasted those statements with his trial theory of self-defense, pointing out defendant did not tell detectives he acted in self-defense. Inasmuch as defendant affirmatively denied any connection to Wasco or Gun Club Road, statements which were directly contradicted by two eyewitnesses and DNA evidence, it was obvious to the jury that he lied to detectives and that these lies were wholly inconsistent with his subsequent trial theory that he acted in self-defense. In these circumstances, the prosecutor's mention of the obvious while casting defendant as a liar based on what he told detective was harmless beyond a reasonable doubt.

### B. *Schuler* Error

#### 1. Procedural Background

During rebuttal argument, the prosecutor displayed Martinez's DMV printout, which was in evidence, on the overhead projector. The prosecutor argued, "[Martinez] was certainly not a small man. He was a maybe bigger man but he is not some huge

monster man that the defense is suggesting[,] talking about that he was so tall and threatening. He is 6'3, about two 240 pounds. He is a big b[o]y. The defendant is also quite [a] large man when it comes to weight not necessarily height." Defense counsel objected on the ground of facts not in evidence, and the court stated, "The visual. Move on."

The prosecutor continued, "The jury can see the defendant sitting here and see that he is a large male. Also Marisol G[.] and in her recorded interview on June 9th, 2021, with the detective that you heard she described the physical appearance of the suspect El Grande as did Raymond Z[.] and they both described him as large, very big and I believe Marisol initially said she thought 200 pounds then realized and corrected herself that he was bigger than that and she said he was shorter, about her height."

Prior to sentencing, defendant filed a motion for a new trial on grounds of *Griffin* error, previously discussed, and *Schuler* error. Defendant argued, in relevant part, that the prosecutor improperly commented on his size during closing argument, in an effort to undermine his self-defense claim. At the hearing, defense counsel argued, "[Defendant] would be the only one [to] have to argue, based on his size, how he felt and raised at the time it was, that's where the defense feels it violated his Fifth Amendment right."[19] The prosecutor disagreed any *Schuler* error occurred, and the trial court denied the motion.

On appeal, defendant argues that the prosecutor's comments about his size were not based on any evidence introduced at trial and the use of his appearance at trial to undermine his self-defense theory at trial violated his constitutional rights. Defendant asserts that he "gained as much as 100 pounds while incarcerated before trial, increasing from around 200 pounds to 300 pounds. With the otherwise strong evidence to support self-defense or imperfect self-defense, this claim was prejudicial because it possibly

---

[19]  Between the filing of the new trial motion and the reply, the trial court relieved trial counsel and appointed a new attorney to represent defendant.

38.

improperly influenced the jury to find that the prosecution had proved beyond a reasonable doubt that [defendant] had not acted in self-defense or imperfect self-defense."

The People contend that no error occurred and assuming error, it was harmless.

## 2. Legal Principles

In *Schuler*, the Ninth Circuit, in a divided opinion, concluded it was error to comment on a criminal defendant's courtroom behavior. (*Schuler, supra*, 813 F.2d at p. 981.) The *Schuler* court explained, "[']Unless and until the accused puts his character at issue by giving evidence of his good character or by taking the stand and raising an issue as to his credibility, the prosecutor is forbidden to introduce evidence of the bad character of the accused simply to prove that he is a bad man likely to engage in criminal conduct.… [¶] This basic principle cannot be circumvented by allowing the prosecutor to comment on the character of the accused as evidenced by his courtroom behavior. That the jury witnesses the courtroom behavior in any event does not make it proper for the prosecutor to tell them, with the court's approval, that they may consider it as evidence of guilt.[']" (*Ibid.*, quoting *United States v. Wright* (1973) 489 F.2d 1181, 1186.) Further, "in the absence of a curative instruction from the court, a prosecutor's comment on a defendant's off-the-stand behavior constitutes a violation of the due process clause of the fifth amendment. That clause encompasses the right not to be convicted except on the basis of evidence adduced at trial. The Supreme Court has declared that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds … not adduced as proof at trial.' [Citation.] We have recognized that a prosecutor may not seek to obtain a conviction by going beyond the admissible evidence." (*Schuler, supra*, at p. 981, quoting *Taylor v. Kentucky* (1978) 436 U.S. 478, 485 & citing *United States v. Schindler* (1980) 614 F.2d 227, 228.)

California law provides, "'In criminal trials of guilt, prosecutorial references to a nontestifying defendant's demeanor or behavior in the courtroom have been held improper on three grounds: (1) Demeanor evidence is cognizable and relevant only as it bears on the credibility of a witness. (2) The prosecutorial comment infringes on the defendant's right not to testify. (3) Consideration of the defendant's behavior or demeanor while off the stand violates the rule that criminal conduct cannot be inferred from bad character.'" (*People v. Boyette* (2002) 29 Cal.4th 381, 434 (*Boyette*), quoting *People v. Heishman* (1988) 45 Cal.3d 147, 197, disapproved in part on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190; accord, *People v. Blacksher* (2011) 52 Cal.4th 769, 840; *People v. Garcia* (1984) 160 Cal.App.3d 82, 93–95.)

"'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.'" (*People v. Gonzalez* (2021) 12 Cal.5th 367, 401, quoting *People v. Morales* (2001) 25 Cal.4th 34, 44.) "'To establish misconduct, [the] defendant need not show that the prosecutor acted in bad faith. [Citation.]' [Citation.] However, '[w]hen attacking the prosecutor's remarks to the jury, the defendant must show that, "[i]n the context of the whole argument and the instructions" [citation], there was "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner."'" (*People v. Bell* (2019) 7 Cal.5th 70, 111.) "'[T]o establish reversible prosecutorial misconduct a defendant must show that the prosecutor used "'deceptive or reprehensible methods'" and that it is reasonably probable that, without such misconduct, an outcome more favorable to the defendant would have resulted.'" (*People v. Navarro* (2021) 12 Cal.5th 285, 332, quoting *People v. Caro* (2019) 7 Cal.5th 463, 510.)

"'A claim of prosecutorial misconduct is ordinarily preserved for appeal only if the defendant made "a timely and specific objection at trial" *and* requested an admonition.'" (*People v. Potts* (2019) 6 Cal.5th 1012, 1035, italics added, quoting *Daveggio and Michaud* (2018) 4 Cal.5th 790, 853 (*Daveggio*); accord, *People v. Gonzales* (2012) 54 Cal.4th 1234, 1275.) "Consistent with that purpose, '[a] court will excuse a defendant's failure to object only if an objection would have been futile' [citation], or if an admonition would not have mitigated the harm caused by the misconduct [citations]." (*Daveggio, supra*, at p. 853, quoting & citing *People v. Jackson* (2016) 1 Cal.5th 269, 349.)

### 3.      Analysis

As an initial matter, the prosecutor commented twice on defendant's size during rebuttal argument. While defense counsel objected to the first comment, he did not object to the second comment, and he did not seek an admonition in either instance, as is required to preserve a claim of prosecutorial misconduct. (*Daveggio, supra*, 4 Cal.5th at p. 853.) In any event, defendant fails to persuade us that a constitutional or state law error occurred.

The prosecutor's reference to defendant's size was responsive to defendant's argument, "[O]n that morning early in the morning a drunken man comes in, and look at his ID, a friendly face, smiling face, how tall the kid was, how heavy he was, and then imagine that man raging, coming through the fence with a shovel, what would a reasonable person believe is coming next?" The prosecutor did not comment on defendant's courtroom behavior or demeanor, and the comments about size did not infringe on defendant's right not to testify or question his character. (*Boyette, supra*, 29 Cal.4th at p. 434; *Schuler, supra*, 813 F.2d at p. 981.)

Moreover, notwithstanding defendant's contrary assertion, there was evidence pertaining to both Martinez's and defendant's sizes introduced at trial. In attempting to demonstrate error based on his trial weight of 300 pounds, defendant focuses on

41.

Marisol's statement that he was around 200 pounds, and he posits that he may have gained 100 pounds.[20] However, Marisol merely estimated defendant's weight at 200 pounds, and she described him as stocky and heavyset. Further, Raymond testified that defendant weighed between 260 and 280 pounds, while a detective testified Raymond estimated defendant's weight at 240 to 260 pounds when he spoke to law enforcement. Defendant was also described as heavyset by both Raymond and a detective involved in defendant's arrest. Additionally, defendant's nickname meant large or big. Thus, the record does not suggest the prosecutor, through reference to defendant's size at the time of trial, mischaracterized his size at the time of the crime, and this is simply not a case where the comments concerning defendant's size either risked inviting jurors to draw inferences concerning his character or infringed on his right not to testify. (*Boyette, supra*, 29 Cal.4th at p. 434; *Schuler, supra*, 813 F.2d at p. 981.)

Finally, even if we assume constitutional error for the purpose of resolving defendant's claim, it was harmless. Even if defendant had gained some weight by the time of trial, the evidence reflects he was heavyset at the time of the shooting, as discussed. Additionally, defendant was seated in a moving vehicle when he shot Martinez, further reducing any importance of weight difference between the two men. We conclude that the prosecutor's brief references to defendant as "also quite large" and "a large male" during closing argument were unquestionably harmless beyond a reasonable doubt. (*Coffman and Marlow, supra*, 34 Cal.4th at p. 60.)

## III.    Cumulative Error

Defendant also claims cumulative error, which "is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant." (*People v. Capers* (2019) 7 Cal.5th 989, 1017; accord, *People v. Winbush* (2017) 2 Cal.5th 402, 487;

---

[20]    The probation report, prepared approximately one month after the jury returned its verdicts, listed defendant's height at 5 feet 6 inches tall and his weight at 300 pounds.

*People v. Hinton* (2006) 37 Cal.4th 839, 897.) Given the absence of any errors to aggregate, defendant's cumulative error claim necessarily fails (*Capers, supra*, at p. 1017), but even if we assume error, as we have done herein, the errors "are cumulatively harmless beyond a reasonable doubt, and did not undermine the fundamental fairness of [the] defendant['s] trial" (*Daveggio, supra*, 4 Cal.5th at p. 866).

**IV.     Clerical Error**

Lastly, the jury found defendant personally and intentionally discharged a firearm causing great bodily injury or death under section 12022.53, subdivision (d), which provides for a sentence enhancement term of 25 years to life. The trial court exercised its sentencing discretion to impose a lesser 10-year term under section 12022.53, subdivision (b), for personal use of a firearm. (*People v. Tirado* (2022) 12 Cal.5th 688, 700.) The trial court's minute order and the abstract of judgment, however, both reflect a 10-year sentence under section 12022.53, subdivision (d).

"Any discrepancy between the judgment as orally pronounced and as recorded in the clerk's minutes or abstract of judgment is presumed to be the result of clerical error" (*People v. Leon* (2020) 8 Cal.5th 831, 855, citing *People v. Mesa* (1975) 14 Cal.3d 466, 471), and we may order correction on review (*People v. Mitchell* (2001) 26 Cal.4th 181, 185, citing *In re Candelario* (1970) 3 Cal.3d 702, 705). The trial court shall direct the issuance of an amended minute order from the sentencing hearing and an amended abstract of judgment reflecting that the 10-year sentence enhancement was imposed under section 12022.53, subdivision (b).

## DISPOSITION

The judgment is affirmed. The trial court shall direct the issuance of an amended minute order from the sentencing hearing and an amended abstract of judgment reflecting a 10-year sentence enhancement was imposed under section 12022.53, subdivision (b).


MEEHAN, J.

WE CONCUR:


DETJEN, Acting P. J.


SMITH, J.